**VICKI BAGLEY REALTY, INC., et al., Appellants,**

**v.**

**Steven Z. LAUFER, et al., Appellees.**

**No. 81–1471.**

District of Columbia Court of Appeals.

Argued Dec. 9, 1982.

Decided Sept. 24, 1984.

Roy E. Green, Washington, D.C., for appellant Vicki Bagley Realty, Inc.

Michael G. Charapp, Washington, D.C., for appellant D'Amecourt Realty, Inc.

Richard T. Rossier, Washington, D.C., with whom Michael B. McGovern, Washington, D.C., was on brief, for appellees.

Before FERREN and TERRY, Associate Judges, and KERN, Associate Judge, Retired.*

* Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

TERRY, Associate Judge:

The appellants in this case, defendants below, are two real estate brokerage companies, Vicki Bagley Realty, Inc. ("Bagley"), and D'Amecourt Real Estate, Inc. ("D'Amecourt"). The trial court, sitting without a jury, found that each appellant had breached a fiduciary duty owed to the appellees and that D'Amecourt's conduct also constituted negligence. The court entered an $8,000 judgment against the real estate companies and a third defendant, John T. Laye.[1] We affirm the trial court's finding of liability, but hold that appellees are limited to a recovery of $5,000 by the liquidated damages clause of the agreement they made with appellant Bagley and co-defendant Laye.

I

Steven and Daniella Laufer owned a town house on Waterside Drive in Northwest Washington. When they decided to sell it, Dr. Laufer, whom the trial court found to be "a knowledgeable, experienced businessman with education, experience, and training in the real estate field," listed the property with D'Amecourt, asking a price greater than its apparent market value.

Bagley, serving as a "cooperating broker," submitted a contract offer on behalf of John T. Laye for purchase of the property. Laye's proposed contract provided, *inter alia*, that he would buy the house after renting it for three months at a rental of $1,000 per month. Apparently worried that such a tenancy, coupled with an escape clause that would have allowed Laye to avoid the contract if he could not obtain financing, might not lead to the sale of the house, Laufer added a clause providing that, at his option, he could take back a deferred purchase money trust, thereby making financing available. The trial court found that Dr. Laufer was not concerned with the credit of the purchaser, and con-

1. Laye is not a party to this appeal.

cluded that Laufer believed that an agreed-upon $10,000 deposit, coupled with a total down payment of $50,000, which apparently was never made, constituted a sufficient credit recommendation. Laye and Laufer agreed to go to settlement on May 1, 1979.

On January 23, 1979, the parties signed certain contracts. Although the precise nature of these documents is not entirely clear from the record, it is undisputed that they included a sales contract and a lease, which was attached to the sales contract. On or about the same date, Bagley received three checks drawn by Laye.[2] One check, payable to the Laufers in the amount of $3,000, was for three months' rent from February through April. A second check for $1,000, payable to Bagley, was given as a security deposit to protect the Laufers against waste or damage to their property during the rental period. The third check, also payable to Bagley, was for $10,000 and represented an earnest money deposit on the contract of sale. The $10,000 check was dated January 22, 1979. On the other two checks, however, the original date was whited out, and February 1 was typed in its place.[3] All three checks bounced.

Dr. Laufer received the $3,000 check from D'Amecourt[4] on or about February 1. When he deposited it a few days later, he discovered that the account upon which it was drawn had been closed. At about the same time he learned that the $10,000 check made out to Bagley had also been

dishonored, even though Bagley, knowing that there would not be sufficient funds in Laye's account until February 1, had held the check for approximately nine days after receiving it in order to make sure it cleared.[5]

The Laufers filed a complaint for possession in the Landlord and Tenant Branch of the Superior Court on April 30, and Laye moved out soon thereafter. A few months later the Laufers filed suit against Bagley, D'Amecourt, and Laye, charging the two brokers with various instances of misrepresentation, failure to account for and remit money, and unworthiness or incompetence to act as real estate brokers, all in violation of D.C.Code § 45–1408 (1973). The trial court entered judgment for $8,000 against the three defendants,[6] and the brokers now appeal, claiming (1) that the trial court should have granted their motion to dismiss the complaint, (2) that the trial court erred in finding them liable, and (3) that even if they were liable, the measure of damages was wrong.

## II

■ Appellants contend that the trial court erred in denying their motion to dismiss the Laufers' complaint.[7] They maintain that the complaint failed to state a claim upon which relief could be granted when it charged them with violations of D.C.Code § 45–1408 (1973)[8] instead of spe-

---

2. The lease, the sales contract, and the three checks have all been included in the record on appeal.

3. Laye testified that the checks were typed by Deborah Doyle, a Bagley employee. Everything on the face of each check is typewritten except, of course, Laye's signature.

4. Bagley apparently turned the rent check over to D'Amecourt, which delivered it to Laufer.

5. Laye testified that he told Deborah Doyle the checks would not clear until February 1.

6. The trial court arrived at this figure by subtracting a $5,000 broker's fee from the $10,000 down payment that Laye was supposed to have made, then adding the $3,000 rent that Laye also owed.

7. Appellants erroneously styled their motion below as a motion for summary judgment. Failure to state a claim upon which relief can be granted is grounds for dismissal of the complaint under Super.Ct.Civ.R. 12(b)(6), not for summary judgment under Super.Ct.Civ.R. 56. Appellants' motion challenged the legal sufficiency of the complaint, and thus it should have been treated as a motion to dismiss. *See American Insurance Co. v. Smith*, 472 A.2d 872, 873–874 (D.C.1984). Since the issue was properly raised in the trial court, albeit under the wrong heading, we shall consider it according to the standards for Rule 12(b)(6) motions.

8. D.C.Code § 45–1408 (1973) was recodified as D.C.Code § 45–1908 (1981). It was then repealed by the District of Columbia Real Estate Licensure Act of 1982, D.C.Law 4–209, 30 D.C.

cifying a cause of action grounded in the common law.

D.C.Code § 45–1408 (1973) was originally enacted by Congress in 1937 as part of an act to regulate real estate brokers in the District of Columbia. Act of August 25, 1937, ch. 760, § 8, 50 Stat. 787, 793. The same statute established the Real Estate Commission of the District of Columbia and gave the Commission the authority to license real estate brokers and agents. In the ensuing years the Commission underwent various reorganizations and name changes. By the time this suit was filed in 1979, its duties had been delegated to the Department of Licenses, Investigations, and Inspections. *See* Commissioner's Order No. 69–96, 15 D.C.Reg. 186 (1969); Mayor's Order No. 78–42, 24 D.C.Reg. 7532 (1978).[9]

Like the commissions that preceded and followed it, the Department had the power to revoke and suspend real estate brokers' licenses. In particular, D.C.Code § 45–1408 (1973) authorized such action when, *inter alia*, (1) the licensee made a "substantial misrepresentation" (subsection (a)), (2) "[p]ursued a continued course of misrepresentation, or [the] making of false promises through agents or salesmen" (subsection (c)), (3) "[f]ailed, within a reasonable time, to account for or to remit any money ... which belong[ed] to others" (subsection (g)), or (4) "[d]emonstrated such unworthiness or incompetency to act as a real-estate broker ... as to endanger the interests of the public" (subsection (h)). In their complaint below the Laufers alleged a violation of each of these four subsections as a ground for their action against the brokers. Appellants contend, however,

that the enforcement of section 45–1408 fell exclusively within the regulatory domain of the administrative agency, and that the statute did not give the Laufers a private right of action. Therefore, they argue, the complaint stated no claim upon which relief could be granted. We find appellants' arguments unpersuasive.

■ We do not reach the question of whether the Code implied a private cause of action in this instance. Although the Laufers' complaint with respect to the brokers is divided into segments that focus on the four subsections of D.C.Code § 45–1408 (1973) quoted above, we decline to view it as based exclusively on the Code. Instead, we read· the four pertinent sections of the complaint as encompassing a common law cause of action for breach of fiduciary duty,[10] and hence we affirm the trial court's denial of the motion to dismiss. Even though the Laufers failed in each of the four sections of the complaint to state in so many words that their claims against the brokers were based on a breach of fiduciary duty, they alleged facts which, if proved, would establish both the existence of a fiduciary duty and a breach. We therefore hold that the complaint stated a claim against each broker cognizable at common law and that the statutory references were mere surplusage.

■ This court has long adhered to "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)

Reg. 390 (1983), which made substantial changes in the statutory scheme for licensing real estate brokers. The corresponding provision of the 1982 Act now appears at D.C.Code § 45–1936 (1984 Supp.).

9. The licensing agency was eventually rechristened the Real Estate Commission of the District of Columbia. D.C.Law 4–209, § 4, 30 D.C.Reg. 390 (1983), codified at D.C.Code § 45–1923 (1984 Supp.).

10. The four sections are headed "Making of Substantial Misrepresentations," "Continued and Flagrant Course of Misrepresentation," "Failure to Account for or Remit Money," and "Unworthiness or Incompetency to Act as Real Estate Broker." Each section contains specific allegations which relate to the heading.

(footnote omitted); *see, e.g., Perry v. District of Columbia,* 474 A.2d 824, 826 (D.C. 1984); *Owens v. Tiber Island Condominium Ass'n,* 373 A.2d 890, 893 (D.C.1977); *Liberty Mutual Insurance Co. v. Citizens Casualty Co.,* 94 A.2d 924, 925 (D.C.1953). We have also held that a court, when considering a motion to dismiss for failure to state a claim, must construe the complaint in the light most favorable to the plaintiff and assume, for the purpose of the motion, that the allegations in the complaint are true. *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C.1979); *see Seek v. Edgar,* 293 A.2d 474, 476 (D.C.1972) ("pleadings should be liberally construed in favor of the pleader"). Finally, Super.Ct.Civ.R. 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice."

When read in light of these principles, the Laufers' complaint easily passes muster. It sets forth specific factual allegations under each of the four headings in the sections relating to the brokers. Appellees argue that the statutory references, which appear at the end of each section, should be interpreted simply as a means of defining the duty of a broker, not as an assertion of a private right of action. Since such an interpretation is by no means unreasonable, we must reject appellants' contention and sustain the trial court's denial of the motion to dismiss.[11]

### III

■ A real estate broker, like any other agent, owes a fiduciary duty to his principal. *Jay v. General Realties Co.,* 49 A.2d

752, 755 (D.C.1946); *accord, e.g., Urban Investments, Inc. v. Branham,* 464 A.2d 93, 96 (D.C.1983); *Ellis v. Morgan,* 65 A.2d 797 (D.C.1949); *Brown v. Coates,* 102 U.S. App.D.C. 300, 302, 253 F.2d 36, 38 (1958); *see also* RESTATEMENT (SECOND) OF AGENCY §§ 13, 381, 424, Introductory Note to Chapter 13 (1958). The trial court found that both D'Amecourt, as the listing broker, and Bagley, as the cooperating broker, owed a fiduciary duty to the Laufers. Cognizant of our limited scope of review,[12] we conclude that this finding is neither plainly wrong nor without evidentiary support.

The record is replete with evidence of the agency relationship that existed between the Laufers and both D'Amecourt and Bagley. For example, Plaintiff's Exhibit 1, which is a "Listing Contract for Residential Multiple Listing," clearly establishes that D'Amecourt was the Laufers' broker. Bagley also had a responsibility toward the Laufers that was very similar, if not identical, to D'Amecourt's. First, Bagley admitted in its answer to the complaint that, like D'Amecourt, it was authorized to solicit offers for the purchase of the property. In addition, Plaintiff's Exhibit 4–A, the contract for the sale of the house, states that D'Amecourt and Bagley were to split the brokerage fee "50/50." Bagley's acceptance of all three checks, on two of which it was named as payee, further attests to Bagley's role as the Laufers' agent.

■ The fiduciary duty owed by a real estate agent or subagent[13] requires the

11. Although we do not reach the issue, we believe that under the four-factor analysis established by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), it is at least arguable that D.C.Code § 45–1408 (1973) provided a private right of action.

12. In cases tried without a jury, as this one was, this court may "review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1981).

13. The Restatement defines a subagent as "a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." RESTATEMENT (SECOND) OF AGENCY § 5(1) (1958). A subagent who knows of the existence of the ultimate principal, however, owes him the same duties owed by the agent. *Id.* at § 428. Although the trial court failed to state in its findings whether Bagley was an agent or subagent, this omission is of no consequence. In either case, the finding that Bagley, a "cooperating agent" whose efforts were to result in a commission split with D'Amecourt,

exercise of the highest fidelity toward the principal. It encompasses an obligation to inform the principal of every development affecting his interest, *Urban Investments, Inc. v. Branham, supra,* 464 A.2d at 96; *Jay v. General Realties Co., supra,* 49 A.2d at 755; *Brown v. Coates, supra,* 102 U.S.App.D.C. at 302, 253 F.2d at 38, which would obviously include any facts known to the agent concerning a prospective purchaser's financial difficulties.

■ In the case at bar, D'Amecourt and Bagley had knowledge of Laye's finances that clearly was significant to their principals, the Laufers. The trial court found, for example, that Bagley "knew or should have known that the $10,000 deposit check [drawn by Laye] could not be cashed until February 1, 1979." This finding is supported by Laye's testimony that he told Deborah Doyle, a Bagley employee, that the check would not clear until February 1, and by the fact that Bagley did not deposit the check until February 1, even though it was dated ten days earlier and had been in Bagley's possession since January 23.[14] The Laufers also introduced into evidence a letter from a "processing officer" with the Bagley firm, stating that she had deposited Laye's $10,000 and $1,000 checks, and that she had "double checked" with the bank and "found these checks to be good." This was not true; Laye's bank dishonored both checks.

■ As for D'Amecourt, the court found that it "had reason to know that there were suspicious circumstances that had not been fully disclosed such as to make a credit report on the Purchaser desirable." These circumstances included D'Amecourt's receipt of the $3,000 check payable to the Laufers, on which the original date was whited out, as well as other indications that the D'Amecourt staff, at least, lacked pertinent information about Laye's finances. Nicole D'Amecourt, the listing agent for the sale and a former officer in the D'Amecourt firm, admitted in her testimony that when she presented the contract to Dr. Laufer, she knew nothing about Laye or his creditworthiness. In addition, D'Amecourt breached its duty to the Laufers by failing to make sure that the $10,000 deposit check had cleared before relinquishing possession of the property.[15]

We are satisfied that the evidence was sufficient to support both the finding that appellants owed a fiduciary duty to the Laufers and the finding that each of them breached that duty. We therefore turn to the question of damages, which is the principal issue on this appeal.

### IV

■ At first glance the ascertainment of damages seems perplexing. We have at issue damages under both a sales contract and a lease. In addition, there are questions regarding the Laufers' efforts to mitigate, as well as whether the intent of the parties may be shown by evidence outside the four corners of their agreement. We conclude, however, that the outcome of this case is dictated by the liquidated damages

---

owed a fiduciary duty to the Laufers is amply supported by the evidence.

14. Laye also testified that, at the suggestion of Deborah Doyle, he had falsified the credit report he submitted to Bagley; Doyle in her testimony denied making any such suggestion. Although the trial court did not make a specific finding on this point, Laye's testimony supports the finding that Bagley "knew that a credit report on Defendant Laye would have been revealing of facts which would have alerted the [Laufers] to reasons for concern."

15. Appellants contend that the trial court, by holding that they had a duty to wait until the checks cleared before turning over possession of the house to Laye, required them to act as guarantors of Laye's $10,000 check. We disagree. The trial court did not impose upon the brokers the duty of a guarantor under the Uniform Commercial Code. *See Harper v. Wyatt,* 281 A.2d 442, 444 (D.C.1971). It simply required the brokers to conduct their business according to generally recognized standards. "Unless otherwise agreed, an agent is authorized to sell only for cash.... If he is authorized to sell on credit, he is under a duty to use care to select a responsible purchaser." RESTATEMENT (SECOND) OF AGENCY § 424 comment c (1958).

provision in paragraph 11 of the sales contract.[16] Viewing the entire agreement between the parties, including paragraph 11, according to basic rules of contract interpretation, we hold that the Laufers' recovery is limited to half of the $10,000 deposit, or $5,000.

■ Because the interpretation of a contract provision is a question of law and not of fact, *Burns v. Hanover Insurance Co.*, 454 A.2d 325, 328 (D.C.1982), we review the trial court's construction of the pertinent documents to determine whether it committed error. We conclude that the trial court made three errors of law when it ruled that the Laufers were entitled to $8,000 in damages.

■ First, the trial court improperly separated the lease from the sales contract when it ruled that the Laufers had "a right to declare a forfeiture under the contract, not forfeiture under the lease." When a written agreement incorporates a second writing, the two documents must be read together as constituting the contract between the parties. *Sheriff v. Medel Electric Co.*, 412 A.2d 38, 41 (D.C.1980); *Trans-Bay Engineers & Builders, Inc. v. Hills,* 179 U.S.App.D.C. 184, 193, 551 F.2d 370, 379 (1976); *Fisk Rubber Co. v. Muller,* 42 App.D.C. 49 (1914); *Nash v. Milford,* 33 App.D.C. 142 (1909). This principle is particularly germane to the present case, in which both the sales contract and the lease specifically referred to the lease as an attachment or addendum to the sales contract. *See* 4 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 628 (3d ed. 1961). In construing this hybrid agreement, therefore, we are required to examine it as a whole. *Chesapeake & Ohio Canal Co. v. Hill,* 82 U.S. (15 Wall.) 94, 103, 21 L.Ed. 64 (1872). We must also read the two documents in a manner that gives a reasonable, lawful, and effective meaning to all their terms. *Kass v. William Norwitz Co.,* 509 F.Supp. 618, 624 (D.D.C.1980); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981). Following these principles, we are led to the conclusion that the forfeiture clause of paragraph 11 is applicable to both the lease and the sales contract, since they are both part of the same agreement.[17]

■ Second, the trial court erred when it refused to consider whether the Laufers had waived their right to recover damages of $3,000 in addition to the earnest money deposit. Under paragraph 11, if the Laufers elected to pursue a legal or equitable

---

**16.** Paragraph 11, which appears on the back of the printed contract form, reads as follows:

FORFEITURE OF DEPOSIT/LEGAL REMEDIES. If the Purchaser shall fail to make full settlement, the deposit herein provided for may be forfeited at the option of the Seller, in which event the Purchaser shall be relieved from further liability hereunder, unless the Seller elects not to forfeit the deposit and notifies the Purchaser and the Agent in writing within 30 days from the date provided for settlement herein of his election to avail himself of any legal or equitable rights which he may have under this contract, other than the said forfeiture. In that event the deposit shall be returned by the Agent holding the same to the Purchaser, and the Agent shall not be liable to the Seller for return of said deposit. In the event of the forfeiture of the deposit, an award of damages by a court, a compromise agreement between Seller and Purchaser, or if the Seller shall fail to take any action or fail to pursue any legal or equitable remedies, *then and in any event, the Seller shall pay the Agent as compensation for his services one-* half thereof, said amount not to exceed the amount of the full brokerage fee, but in no event to be less than one-half of the amount of the Purchaser's deposit. If after a breach by the Purchaser, the Seller shall release the Purchaser from liability hereunder or authorize refund of the deposit monies, the Seller shall be liable to the Agent for a commission equal to one-half of the amount of the Purchaser's deposit not to exceed the amount of the full brokerage fee.

We interpret the words "forfeit" and "forfeiture" in this paragraph as meaning that if the purchaser fails to make full settlement, the seller may keep the deposit as liquidated damages and terminate the contract. *See Sheffield v. Paul T. Stone, Inc.,* 68 App.D.C. 378, 379–380, 98 F.2d 250, 251–252 (1938).

**17.** Our conclusion is supported by the trial court's finding that "the lease and sales contract are interwoven...." The court also noted that "the remedies provided in the contract in the event of Defendant's breach were contemplated by all parties as part of the lease agreement."

remedy instead of forfeiting the deposit, they had a duty to notify the brokers and Laye in writing of their decision within thirty days of the date on which settlement was to occur.[18] Because they failed to give such notice, they waived their right to any remedy other than forfeiture of the deposit.[19] The trial court rejected this defense on the ground that it was not set forth by the brokers in their pleadings, but our review of the pleadings convinces us that it was raised by both D'Amecourt and Bagley.[20]

Third, the trial court erred in finding "that it was in the contemplation of all the parties at the time of entering this lease that the Plaintiff would have his remedies under paragraph 11 of the sales contract in addition to the $3,000.00 rent deposited by Defendant Laye." We have held that the sales contract and the lease must be read together as a single document, and that the forfeiture provision in paragraph 11 is applicable as a limitation on the total recovery under both. The contract was carefully drawn to reflect the intent of the parties; there was no need to look beyond it for further evidence of that intent. The court was not free to award a greater amount than the liquidated damages clause provided. *See Burns v. Hanover Insurance Co., supra; cf. MacNamee v. Hermann,* 60 App.D.C. 295, 53 F.2d 549 (1931).

Upholding the liquidated damages provision in the present case is consistent with one of the main purposes of such a clause: to simplify the resolution of a breach of contract dispute. In addition to giving the parties an opportunity to resolve the damages question without resorting to litigation, *Davy v. Crawford,* 79 U.S.App. D.C. 375, 376, 147 F.2d 574, 575 (1945), a liquidated damages clause allows the parties to fix the measure of damages at the outset, before a breach even occurs. Such a provision is particularly appropriate when the parties enter into a contract like the one at bar, "where the damages to be ascertained are uncertain in amount and cannot be easily ascertained." *District of Columbia v. Harlan & Hollingsworth Co.,* 30 App.D.C. 270, 278–279 (1908); *accord, Burns v. Hanover Insurance Co., supra,* 454 A.2d at 327; *Barnette v. Sayers,* 53 App.D.C. 169, 172, 289 F. 567, 570 (1923).

In *District of Columbia v. Harlan & Hollingsworth Co., supra,* the court, in enforcing a liquidated damages clause, recognized that it would have been difficult for the parties to calculate the actual damages that resulted from the defendant's failure to deliver a fireboat as promised. Similarly, the actual damages in the instant case cannot be precisely fixed. Given the hybrid nature of the agreement as both a lease and a contract of sale, it is difficult to characterize Laye's failure to pay as a breach of either part of the agreement without reference to the other.[21] Consequently, it is all but impossible to measure damages. In addition, if the Laufers had attempted to mitigate their damages, could they have done so by finding another renter, or would they have had to find another buyer, or both? The availability of liquidated damages obviates any attempt to answer that question.

Although we are aware that the law, as a general rule, abhors a forfei-

---

**18.** The parties had agreed that settlement would take place on May 1, 1979.

**19.** In their brief appellees confirm that the "liquidated damages remedy was the remedy that the Laufers elected against the purchaser."

**20.** In its answer to the complaint D'Amecourt argued that "Plaintiff is estopped from asserting the claims set forth in the complaint" ("Third Defense") and "Plaintiffs may not state the claim set forth in the complaint because they

have waived all rights" ("Fourth Defense"). In Bagley's answer the second defense was that "Plaintiffs have waived and are otherwise estopped from asserting any of the claims asserted in the Complaint."

**21.** On the present record, we cannot treat the agreement in this case as a rental contract with an option to buy, as the court did in *Davy v. Crawford, supra.*

ture, *Neuffer v. Bakery & Confectionery Workers International Union,* 113 U.S. App.D.C. 334, 336, 307 F.2d 671, 673 (1962), we also recognize that reasonable contracts are to be upheld. *Id.* We believe that the parties in this case entered into such a reasonable agreement. In addition, the courts have repeatedly upheld the right of parties to fix in advance a specific sum to be forfeited as liquidated damages, provided that this sum does not constitute a penalty. *See, e.g., Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 126 (D.C. 1976), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977); *Davy v. Crawford, supra,* 79 U.S.App.D.C. at 376, 147 F.2d at 575. Applying the test set forth most recently by this court in *Burns v. Hanover Insurance Co., supra,*[22] we conclude that the liquidated damages clause set forth in paragraph 11 does not impose a penalty and is therefore valid.

## V

■ Thus far we have held that the Laufers were entitled to liquidated damages as a result of the breach of contract by Laye, the purchaser, and that the brokers' fiduciary duty was breached when they failed to inform the Laufers of Laye's financial situation and then relinquished possession of the property before his checks cleared. The liquidated damages clause, of course, would normally determine only the amount for which Laye would be liable to the Laufers. On the facts of this case, however, we hold that it limits the amount of the brokers' liability as well.

■ The Laufers' recovery cannot be greater than the actual damage flowing

from the brokers' breach of their fiduciary duty. *See* RESTATEMENT (SECOND) OF AGENCY § 400 comment b (1958). If the brokers had made certain that Laye had enough money in the bank to cover his checks (or if they had not surrendered possession to Laye until the checks cleared), the Laufers, given Laye's breach of contract, would have been entitled to damages of only $5,000. This figure would have been dictated by the terms of the liquidated damages clause, which provided that even if settlement did not follow the purchaser's delivery of the earnest money deposit, the Laufers, so long as the $10,000 was received, were to pay the brokers half of that amount, or $5,000.[23] The Laufers would then be left with $5,000, the remaining half of the deposit. By reducing the judgment to that figure, we are simply directing that the Laufers recover the amount they would have received had the brokers not breached their fiduciary duty; in other words, we are limiting their recovery to the actual loss resulting from the breach. *See Hiller v. Helen L. Lips Realty, Inc.,* 102 Misc.2d 367, 423 N.Y.S.2d 406 (Sup.Ct.1979); *Paul v. Grimm,* 165 Pa. 139, 30 A. 721 (1895); *Hopkins v. Wardley Corp.,* 611 P.2d 1204 (Utah 1980); RESTATEMENT (SECOND) OF AGENCY § 424 comment d (1958). *See also Witt v. John Blomquist, Inc.,* 249 Minn. 32, 81 N.W.2d 265 (1957); *Zwick v. United Farm Agency, Inc.,* 556 P.2d 508 (Wyo. 1976). The Laufers cannot recover the additional $3,000 in unpaid rent because, as we have held, the lease and the sales contract together constituted the agreement among the parties, and the liquidated dam-

---

**22.** "[D]amages stipulated in advance should not be more than those which at the time of the execution of the contract can be reasonably expected from its future breach, and agreements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced." *Burns v. Hanover Insurance Co., supra,* 454 A.2d at 327, quoting from *Order of AHEPA, supra,* 367 A.2d at 126, quoting from *Davy v. Crawford, supra,* 79 U.S.App.D.C. at 376, 147 F.2d at 575.

**23.** In other words, had the brokers found a solvent purchaser, and had that purchaser written a valid deposit check for $10,000 and then failed to settle, the Laufers would have been entitled to only half of the deposit; the other half would have gone to the brokers as compensation for their services.

ages clause limits the total recovery under both parts.[24]

We affirm the judgment insofar as it imposes liability on appellants. With respect to the amount of damages, the judgment is reversed, and the case is remanded with instructions that a new judgment be entered for appellees in the amount of $5,000, plus appropriate interest and costs.

*Affirmed in part, reversed in part, and remanded.*

**24.** Although we believe that the award against the brokers may be sustained simply by virtue of their breach of contract, we also affirm the trial court's finding, well grounded in the evidence, that D'Amecourt's conduct constituted negligence. *See Palmer v. Garves,* 123 A.2d 611 (D.C.1956); *Lewis v. Shiffers,* 67 A.2d 269 (D.C. 1949). This does not mean, however, that the Laufers are entitled to any additional damages, for there is no evidence that they suffered any injury due to D'Amecourt's negligence beyond that which resulted from D'Amecourt's breach of its fiduciary duty.